United States District Court
Middle District of Florida
Jacksonville Division

**CHRISTOPHER VALDEZ,**

    *Plaintiff,*

v.                                                                                         NO. 3:14-CV-1328-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

---

### Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of the Social Security Administration denying Christopher Valdez's claim for disability-insurance benefits. He seeks reversal; the Commissioner, affirmance. The Court incorporates the record summarized by the Administrative Law Judge ("ALJ"), Tr. 11–20, and the parties, Doc. 14 at 1–8; Doc. 15 at 1–5, 8–12.

### Issue

Valdez presents one issue: whether the ALJ erred in weighing the medical evidence by failing to state the weight she gave his treating physicians' opinions.

### Background

Valdez was 52 at the time of the ALJ's decision. Tr. 19, 21, 29. He last worked in March 2011. Tr. 29–30. He completed two years of college and has experience as a computer consultant and a network systems director. Tr. 32–33, 247. He alleged he had become disabled in August 2010 (amended to March 2011) due to sacroiliac joint

dysfunction, gout, neuropathy, diabetes, high blood pressure, mitral valve prolapse, acid reflux, back pain and spasms, and bursitis in his left shoulder. Tr. 29, 202, 246. His last-insured date for his eligibility for benefits was December 31, 2015. Tr. 11, 13, 276. He proceeded through the administrative process, failing at each level. Tr. 1–3, 8–21, 49–58, 60–69. This case followed. Doc. 1.

## ALJ's Decision

At step two,[1] the ALJ found Valdez has severe impairments of osteoarthritis and obesity. Tr. 13. At step three, she found none of his impairments, individually or in combination, meet or equal the severity of any impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, including Listing 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine). Tr. 13–14. After stating she had considered the entire record, she found Valdez has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b)[2] with the additional limitations he (1) can stand for 2 hours; (2) can only occasionally conduct

---

[1] The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking: (1) is he engaged in substantial gainful activity; (2) does he have a severe impairment or combination of impairments; (3) does the impairment meet or equal the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1; (4) given his residual functional capacity (RFC), can he perform any of his past relevant work; and (5) given his RFC, age, education, and work experience, are there a significant number of jobs in the national economy he can perform. 20 C.F.R. § 404.1520(a).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

overhead reaching; (3) must avoid exposure to concentrated temperate extremes, vibrations, and hazards; (4) cannot climb ramps, stairs, ladders, ropes, or scaffolds; (5) can only occasionally stoop, crouch, crawl, and kneel; and (6) must be able to switch between sitting and standing at will. Tr. 14.

The ALJ observed Valdez received treatment at Baymeadows Primary Care for his general healthcare needs and his treatment consisted mainly of "medication management and refills." Tr. 15. She summarized the treatment notes for his visits there from his alleged onset date, March 2011, to his most recent office visit before her decision, September 2012.[3] Tr. 15–18. He struggled with weight gain and high blood pressure.[4] Tr. 15. While he reported back pain in April 2011, she observed his treating physician made no objective finding regarding back pain, identified weight gain and vital signs as the only abnormalities, and prescribed Valium. Tr. 15. He continued to suffer from back pain and his diabetes was uncontrolled in July 2011. Tr. 16. He was referred for bilateral hand radiographs at his October 2011 visit

---

[3]Valdez saw various practitioners at Baymeadows Primary Care, including Talat Imam, M.D., Hussain Imam, M.D., and William Finan, D.O. Tr. 361–408, 423, 431–70. The ALJ refers only to Dr. Imam and Dr. Imam, at times mentioning no treating physician and twice mentioning the wrong one. *See* Tr. 17 (Valdez saw Dr. Finan, not Dr. Imam, in May 2012, Tr. 438–40, and Barbara Steplock, P.A., not Dr. Imam, in September 2012, Tr. 453–56). Because Valdez does not make any particular argument as to each provider, the Court generically refers to "the treating physician" as the provider who saw him on that particular visit.

[4]The ALJ cited the following measurements: 303 pounds with a blood pressure of 115/72 (March 2011); 313.6 pounds with a blood pressure of 147/83 (April 2011); 305 pounds with a body mass index (BMI) of 39.2 and a blood pressure of 151/91 (December 2011), 280 pounds with a BMI of 36 (May 2012), and 280 pounds with a BMI of 36 and a blood pressure of 171/103 (September 2012). Tr. 15–17.

because he had swelling in both hands but no bone or joint abnormalities or carpal tunnel syndrome. Tr. 16. In December 2011, he had normal cardiac function, a slow gait with a limp, decreased range of motion, and back pain. Tr. 16. He was diagnosed with non-insulin dependent diabetes, chronic low back pain, gastroesophageal reflux disease (GERD), and hypertension (high blood pressure).[5] Tr. 16. He had not followed his diet and exercise regimen by February 2012, and his follow-up examination was identical to his previous one. Tr. 16.

In May 2012, he had normal muscle tone and strength, was neurologically intact, still had a limp, demonstrated mild diffuse gastrointestinal pain, and had decreased range of motion in his back, pain with flexion and extension, and hyperesthesia (abnormal acuteness of sensitivity to touch, pain, or other sensory stimuli). Tr. 16. The next month there were no significant musculoskeletal deficits or evidence of clubbing, cyanosis (bluish coloring of the skin and mucous membrane due to a lack of oxygen), ischemia (local anemia due to mechanical obstruction of the blood supply), or infection, and his gait and deep tendon reflexes were normal. Tr. 16. In July 2012, his gait was slow, and he had decreased range of motion and pain in his back. Tr. 16. He reported pain relief in his lower back with medication in September 2012, although he had compliance issues following up as directed, getting consistent lab work, and performing home-blood-glucose monitoring. Tr. 17. He also received prescription refills at this appointment. Tr. 17.

---

[5]All parenthetical definitions of medical terms are from STEDMAN'S MEDICAL DICTIONARY (William R. Hensyl et al. eds., 25th ed. 1990).

The ALJ found the evidence supported his suffering from low back pain; however, she observed his doctors treated him conservatively with medication rather than physical therapy or surgery. Tr. 17. She observed his doctors recommended weight loss and found his claims he could not exercise from right leg pain and neuropathy inconsistent with his May, June, and July 2012 exams revealing a normal (though slow) gait, no need to use a cane, and reported relief from neuropathy due to medication (Lyrica and later Gabapentin). Tr. 17. She found his activities of daily living (taking care of his personal hygiene, watching television, listening to the radio, taking care of his dogs, cooking, cleaning, walking, and using the computer for email and Facebook) greater than expected of a disabled individual and his claim of suffering at least ten bad days a month questionable because he never reported that to his physicians, attempted to seek treatment for any issues with his lower extremities, or did anything beyond sitting exercises to alleviate pain. Tr. 17.

The ALJ summarized the findings of Lynn Harper-Nimock, M.D., from a July 2011 internal-medicine examination. Tr. 15. Dr. Harper-Nimock made the following observations: (1) Valdez weighed 301 pounds, had a BMI of 42, blood pressure of 160/98, and an abnormal gait; (2) he had a normal stance and his joints were stable; (3) he appeared to be in mild distress, could not walk on his heels or toes, or squat, and walked with a cane; (4) he did not need help changing for the examination but had difficulty getting on and off the examination table; (5) his chest and lungs were normal; (6) his cervical and lumbar spine showed decreased flexion, extension, lateral flexion, and decreased rotary motion bilaterally; (7) he had decreased range of motion

of the wrists, hips, knees, ankles, and shoulders bilaterally; (8) he had full strength in his upper and lower extremities; and (9) he had intact hand and finger dexterity and full grip strength bilaterally. Tr. 15–16. She "offered diagnostic impressions of sacroiliac joint deformity, degenerative disc disease with radiculopathy, non-insulin-dependent diabetes, degenerative joint disease, gout, peripheral neuropathy, hyperlipidemia, obesity, previous myocardial infarction, hypertension, and carpal tunnel syndrome" and gave Valdez "a poor prognosis." Tr. 16.

Dr. Harper-Nimock opined Valdez "had moderate limitations for prolonged sitting, standing, walking, climbing, heavy lifting, pushing, or pulling." Tr. 16. The ALJ gave these opinions great weight and accounted for them in her residual-functional-capacity finding, including his abnormal gait (the sit-stand option and the two-hour standing limitation); his decreased cervical and lumbar spine flexion and extension, decreased rotary motion, positive straight-leg raise, and decreased range of motion in his shoulders, wrists, hips, knees, and ankles (limiting exposure to extreme temperatures, vibrations, and hazards); and the mild effusion in both knees (restricting climbing and limiting stooping, crouching, crawling, and kneeling). Tr. 18. The ALJ concluded the remaining findings supported "a wide range of ability," including full strength in his extremities and grip, no muscle atrophy, and intact hand and finger dexterity. Tr. 18.

The ALJ considered and rejected Valdez's obesity as an impairment precluding all work activity. Tr. 18. She found no evidence of a mental impairment interfering with daily functioning despite a Valium prescription for anxiety. Tr. 18. After

observing the opinions of non-examining state-agency physicians do not deserve as much weight as examining or treating physicians, she found they deserve some weight, "particularly in a case like this in which there exist a number of reasons to reach similar conclusions." Tr. 18. They found he was not disabled because he was capable of a reduced range of light work but observed he was limited in overhead reaching and postural manipulations. Tr. 18–19. The ALJ incorporated the limitation into her residual-capacity-finding. Tr. 14, 18–19. She found these assessments consistent with the greater weight of the evidence, including Dr. Harper-Nimock's findings. Tr. 19. She also included the sit-stand option to account for his foot pain, which the state-agency physicians did not address. Tr. 19.

The ALJ also credited Valdez's testimony he cannot lift over 15 to 20 pounds or anything above his shoulders, finding these limitations compatible with her residual-functional-capacity finding. Tr. 19. Based on his residual functional capacity, she determined he could perform no past relevant work. Tr. 19. Relying on the testimony of a vocational expert, she concluded he had skills transferable to sedentary work. Tr. 19. She found he could perform jobs (help-desk representative, surveillance-systems monitor, and order clerk) and thus was not disabled. Tr. 20.

## Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not

7

decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.*

## Analysis

A medical opinion is a statement reflecting judgment about the nature and severity of an impairment and what a claimant can still do despite it. 20 C.F.R. § 404.1527(a)(2). An ALJ must evaluate each medical opinion regardless of its source, 20 C.F.R. § 404.1527(c), and state with particularity the weight he gives it and the reasons why, *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); *Shafarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). An ALJ must give considerable weight to a treating physician's opinion unless he shows good cause for not doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if (1) the evidence did not bolster the opinion, (2) the evidence supported a contrary finding, or (3) the opinion was conclusory or inconsistent with his own medical records. *Id.* at 1240−41. If an ALJ disregards the opinion, he must clearly articulate his reasons. *Id.* Substantial evidence must support those reasons. *Id.*

An ALJ must consider all record evidence in making a disability determination. 20 C.F.R. § 404.1520(a)(3). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (quotations omitted). An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing

court." *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir. 1983). An ALJ has a heightened duty to discuss medical opinions and may not implicitly reject them where the reasons are not obvious. *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 963 (11th Cir. 2015).

If an ALJ fails to state the weight given to medical opinions, the error is harmless if the opinions do not contradict the ALJ's findings. *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005). An error is harmless if it does not affect the outcome or a party's substantial rights. *Perry v. Astrue,* 280 F. App'x 887, 893 (11th Cir. 2008). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Valdez argues that although the ALJ reviewed the treatment notes from his physicians, she failed to state the weight she gave their opinions. Doc. 14 at 6–7. He argues she relied on their treatment notes from after Dr. Harper-Nimock's July 2011 evaluation, in May, June and July 2012, to support her decision he is not disabled. Doc. 14 at 7. He observes the ALJ cited notes indicating he did not have clubbing, cyanosis, ischemia, or infection, he had a normal gait and deep tendon reflexes, and intact neurological function, and he did not require a cane. Doc. 14 at 7. But he argues "these notes from the treating doctors paint a different picture of" him: in May 2012 he walked with a limp, had decreased range of motion in the back, hyperesthesia, seemed to be in severe pain, was lethargic and anxious; in June 2012, his symptoms were "quite severe" and he presented with chronic low back pain, characterized as

9

constant and radiated to the buttocks and thighs; in July 2012, he again presented with chronic low back pain and the treating physician noted his gait was slowed, he had decreased range of motion and pain with movement in the back. Doc. 14 at 7–8. While he acknowledges the ALJ need not discuss every medical note, he argues her analysis should be an accurate summary of the findings "particularly when these notes from the basis for the decision and more importantly when the notes are from the treating physician." Doc. 14 at 8. He argues the ALJ discussed Dr. Harper-Nimrock's opinions "in rather explicit detail," assigning them great weight, even though they were entitled to less weight than his treating physicians because she was a consulting examiner. Doc. 14 at 8–9. He similarly argues the ALJ gave the state-agency non-examining physicians great weight but failed to mention the weight given to the treating physicians, which is not harmless because her notes summary was inaccurate. Doc. 14 at 9.

The Commissioner responds not all treatment notes are medical opinions. Doc. 15 at 7. She argues the ALJ's discussion of the treatment notes, while not a verbatim repetition of every statement made in them, "is fully consistent with the corresponding records." Doc. 15 at 8. She argues Valdez failed to prove the treating physicians offered opinions regarding his functional limitations greater than the ALJ's residual-functional-capacity finding. Doc. 15 at 8. She argues they offered no opinions about his ability to work. Doc. 15 at 8 (citing Tr. 438–48). As to the May 2012 treatment notes, she observes not only was he in severe pain and lethargic, he was diagnosed with an acute upper respiratory infection, chills, cough, fever, and fatigue.

10

Doc. 15 at 8 (citing Tr. 439). She argues the treatment records are consistent with Dr. Harper-Nimock's findings. Doc. 15 at 9–10. She observes Valdez does not challenge the weight the ALJ afforded Dr. Harper Nimock's opinions. Doc. 15 at 10 n.3. She argues that even if the ALJ failed to sufficiently articulate the weight she gave the treatment notes, the failure is harmless because the ALJ accounted for the clinical findings in her residual-functional-capacity finding. Doc. 15 at 10–11. She argues an ALJ may give non-examining physicians weight greater than the opinions of treating or examining sources under certain circumstances and did so here because their opinions were consistent with the other evidence. Doc. 15 at 11–12. She concludes the ALJ properly weighed the evidence to determine Valdez's residual functional capacity and substantial evidence supports the decision. Doc. 15 at 12.

Valdez does not specify any particular disabling condition the treatment notes addressed but the ALJ disregarded. The treatment notes do not appear to contain medical opinions as defined under 20 C.F.R. § 404.1527(a)(2) because they do not contain judgments about the nature and severity of Valdez's chronic low back pain (or other conditions) and what he can still do despite it. His physicians' observations do not relate to his ability to work despite suffering from pain and other impairments. To the extent the Court can construe the physicians' notes as medical opinions, the ALJ did not explicitly state she gave them great weight but did so implicitly by recognizing treating physicians are entitled to significant weight, Tr. 18, discussing their treatment notes in great detail, Tr. 15–18, and finding a residual functional capacity consistent with their observations, Tr. 14–19.

Valdez recognizes the treatment notes formed the basis of the ALJ's decision. Doc. 14 at 8. He nevertheless disagrees the treatment notes cited support the ALJ's findings based on his interpretation of the evidence. Although he cites the treating physician's observation during the May 2012 visit he seemed to be in severe pain, that was a general observation. Tr. 439. He ignores the musculoskeletal and neurologic observations the ALJ specifically referenced in her decision, Tr. 16–17, 439, and that he sought care that day for a fever and related symptoms, Tr. 439. At both his June and July 2012 visits, he was in no apparent distress and sought medication refills. Tr. 441, 443, 445, 447. The Court cannot reweigh the evidence and focus only on Valdez's chronic low back pain in isolation as he suggests rather than reviewing the notes in context and in light of his overall treatment plan as the ALJ did. *See Moore*, 405 F.3d at 1211. She accounted for his pain with the sit-stand option, declining to impose any greater limitation because his physicians treated his condition conservatively, with medication and a weight-loss recommendation. Tr. 17. Substantial evidence supports the decision. Tr. 432, 436, 444, 448, 456.

Valdez does not explain the significance of the ALJ citing treatment notes after Dr. Harper-Nimock's evaluation or recognize she also cited treatment notes from before the evaluation. He does not explain how the state-agency physicians' opinions were inconsistent with the greater weight of the evidence. His argument can be reduced to the ALJ's failure to write that she was giving the treating physician records great weight when the law does not require that degree of particularity. *See Jamison*, 814 F.2d at 589. Even had the ALJ erred in failing to explicitly state she

gave great weight to the treating-physician opinions in the record, he must show such error was harmful. *See Shinseki,* 556 U.S. at 409. He failed to meet that burden as it is apparent she gave their opinions great weight and whether she said so explicitly would not change the outcome.

## Conclusion

The Court **affirms** the Commissioner's decision denying Valdez's claim for benefits and **directs** the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on March 4, 2016.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   Counsel of Record